**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| PIRELLI ARMSTRONG TIRE CORPORATION RETIREE MEDICAL BENEFITS TRUST individually and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>WALGREEN COMPANY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

FILED: APRIL 2, 2009
09CV2046
JUDGE KENDALL
MAGISTRATE JUDGE NOLAN

No. DAJ

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Pirelli Armstrong Tire Corporation Retiree Medical Benefits Trust ("PMBT"), individually and on behalf of all others similarly situated, for its complaint against Defendant Walgreen Company d/b/a Walgreens ("Walgreens"), upon knowledge as to itself and its own acts, and upon information and belief as to all other matters, alleges as follows:

## NATURE OF THE ACTION

1.     Walgreens, which operates more than 7,000 pharmacies in forty-nine (49) states, the District of Columbia and Puerto Rico, engaged in an unlawful scheme to overcharge insurance companies, self-insured employers and union health and welfare funds (collectively referred to as "third-party payors" or "TPPs"), when dispensing generic versions of three brand-name drugs: (1) Zantac, which is known generically as ranitidine HCl ("ranitidine"); (2) Prozac, which is known generically as fluoxetine hydrochloride ("fluoxetine"); and (3) Eldepryl, which is known generically as selegiline hydrochloride ("selegiline").  Walgreens adopted a corporate policy to systematically and unlawfully fill prescriptions by changing the dosage forms, which

were subject to strict reimbursement limitations, to a more expensive dosage forms not subject to such limitations.  For example, even though a pharmacy cannot legally change a prescription without a physician's express authorization, Walgreens would fill a prescription written for low-priced ranitidine 150-mg *tablets* with much more expensive ranitidine 150-mg *capsules*.  *See, e.g.,* ¶ 34, *infra*.  This scheme enabled Walgreens to garner large profits by illegally changing prescriptions.  However, as a result, Plaintiff and other third-party payors reimbursed two to four times more for than they should have had the prescriptions been filled as written.  Plaintiff asserts causes of action for unjust enrichment (Count I) and violations of thirty-five (35) state consumer protection statutes (Count II).

2.      On June 4, 2008, the United States Department of Justice announced Walgreens' agreement to pay $35 million to the United States, 42 states and Puerto Rico for overcharging state Medicaid programs by filling prescriptions with the more expensive dosage forms of ranitidine, fluoxetine and selegiline.  The government claims were asserted in a "whistleblower" lawsuit styled *United States of America ex rel. Bernard Lisitza v. Walgreen Co.*, No. 03-C-00744 (N.D. Ill.).

## JURISDICTION AND VENUE

3.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d)(2), which provides federal district courts with original jurisdiction over civil actions in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, and in which the matter in controversy is a class action in which "any member of a class of plaintiffs is a citizen of a state different from any defendant."

4.      Venue is proper within this District under 28 U.S.C. §1391(b) because Defendant is found or transacts business within this District, and the interstate trade and commerce, hereinafter described, is carried out, in substantial part, in this District.

## THE PARTIES

5.      Plaintiff Pirelli Armstrong Tire Corporation Retiree Medical Benefits Trust ("PMBT") is a voluntary employee benefits association maintained pursuant to the federal Employee Retirement Security Act, 29 U.S.C. §§ 1132, *et seq.*, and pursuant to the settlement of a federal court action (Case No. 3:94-0573) brought in the United States District Court for the Middle District of Tennessee against Pirelli Armstrong Tire Corp. ("Pirelli") in the early 1990s by many Pirelli retirees, for the purpose of providing health and medical benefits to eligible participants and beneficiaries.  PMBT maintains its principal place of business in Goodlettsville, Sumner County, Tennessee.  PMBT was injured by Defendant's conduct alleged herein because it reimbursed for purchases of the generic drugs at issue in this case at prices higher than the Maximum Allowable Costs ("MAC") prices for alternative formulations of those drugs.

6.      Walgreen Company d/b/a Walgreens is an Illinois corporation headquartered in Deerfield, Illinois.  Walgreens operates approximately 7,000 retail pharmacies stores in 49 states, the District of Columbia, and Puerto Rico.

## FACTUAL ALLEGATIONS

**A.    Prescription Drugs**

7.    There are at least 11,000 different prescription drugs in the United States market. Under the federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301, *et seq*., (the "FDCA"), a manufacturer must obtain approval from the FDA before a new drug can be manufactured and sold.  A manufacturer seeks approval for a new drug, often referred to as a "pioneer drug," by filing a New Drug Application ("NDA") with the FDA demonstrating that the drug is safe and effective for its intended use.  New drugs that are approved for sale in the United States by the FDA are often covered by patents and marketed under a brand name.

8.    Generic drugs are drugs which the FDA has found to have the same active chemical composition and provide the same therapeutic effects as the pioneer, brand name drug. When a generic drug is bioequivalent to a pioneer or brand name drug, the FDA assigns the generic drug an "AB" rating.  According to the FDA, a bioequivalent drug rated "AB" may be used and substituted interchangeably with the referenced branded drug.  For purposes of this Action, all three drugs at issue are currently available as generics.

9.    Once the safety and effectiveness of a new drug is approved by the FDA, it may be used in the United States only under the direction and care of a physician who writes a prescription, specifying the drug by name.  The drugs must then be purchased from a licensed pharmacist, such as Walgreens.  The pharmacist must, in turn, fill the prescription with the drug brand specified by the physician, unless an AB-rated generic version of that pioneer drug which has been approved by the FDA is available.  For instance, once a physician writes a prescription for a brand-name drug such as Zantac, that prescription can be filled only with the actual drug

4

named or its AB-rated generic equivalents.  Only generic drugs that carry the FDA's "AB" rating may be substituted by a pharmacist for a doctor's prescription for a brand name drug.

10.    If an AB-rated generic formulation of a brand name drug exists and the physician has not specifically indicated on the prescription "DAW" or "dispense as written" (or similar indications, the wording of which varies slightly from state to state), then: (a) for consumers covered by insurance that includes a prescription benefit plan, the pharmacist will substitute the generic drug; and (b) for consumers whose purchases are not covered by prescription drug benefit plans, the pharmacist will offer the consumer the choice of purchasing the AB-rated generic drug at a lower price.

11.    While absent a dispense as written prescription a pharmacist can substitute an AB-rated generic for a brand name drug, a pharmacist cannot change a physicians' prescription for a tablet version or a drug for a prescription for a capsule version of a drug, or vice-versa. Although capsule and tablet forms of a drug contain the same active ingredient, capsules and tablets are different both in their physical form as well as their administration schedules.  A capsule consists of two halves of an oval shaped gelatinous covering enclosing the active ingredient in solid form (usually fine granules or powder).  As soon as the capsule enters the system the capsule shell melts and the medication is immediately absorbed into the system.  A tablet, on the other hand, is a solid piece consisting of the active ingredient or a mixture of a filler material and the active ingredient.  Because the medication in tablets is forged together to make it cohesive, it may take longer for the medication to break down.  Thus, there are medical or pharmacologic reasons that a physician might prescribe a capsule over a tablet, or vice-versa. For this reason, federal and state laws prohibit the substitution of a tablet for a capsule, or vice-versa, without a physician's authorization.

B.     **Pharmacy Reimbursement for Prescription Drugs**

12.     Retail pharmacies such as Walgreens fill prescriptions for customers who have insurance that covers prescription drugs and for customers who do not have such insurance. Those customers who do have private insurance (as opposed to government programs such as Medicaid) get prescription drug coverage from insurance companies, self-insured employers or union health and welfare funds. While those customers usually pay either a flat or percentage "co-pay" for prescription drugs, the remainder of the price of the drug is paid by the TPP. During the Class Period, the vast majority of consumers had some type of prescription drug coverage. Indeed, approximately 64% of all reimbursements for drugs are paid by TPPs and nearly 80% of a pharmacy's revenue comes from prescriptions that are paid in part by private insurance. Therefore, pharmacies are very aware of how they are paid for prescriptions covered by insurance.

13.     The focus on insured customers has had a significant impact on pharmacy management. While pharmacies determine what price they will charge insured customers, insurance companies and pharmacy benefit managers (or "PBMs") acting on behalf of TPPs establish the rate at which they will reimburse the pharmacy for prescriptions. Pharmacies usually are not allowed to charge more than an established reimbursement rate.

14.     The reimbursement rate, or price, for a third-party prescription is based on a reimbursement-rate formula that is specified in the contract between the pharmacy and TPP, or the PBM for the TPP. The reimbursement-rate formula almost universally consists of two parts: the ingredient cost portion and the dispensing fee. The ingredient cost portion is intended to pay the pharmacy for the cost of the drug product, and the dispensing fee is intended to cover the cost of dispensing the prescription.

6

15.     In the case of multi-source drugs, drugs like generic drugs that are available from more than one source, ingredient cost is in most cases based on a Maximum Allowable Cost, or MAC.  The MAC for a particular drug is set by a TPP or PBM and represents the most the payor will reimburse the pharmacy for that drug regardless of which manufacturer's version of the drug is dispensed.  The federal government also calculates and publishes a list of MACs for selected generic drug products, and some third-party payors, rather than developing their own, proprietary MACs, use the federal MAC lists.  Since PBMs usually pay pharmacies at MAC, TPPs in turn reimburse at MAC plus a certain percentage.

16.     The MAC is based on information that third-party payors and PBMs gather in the marketplace about prices.  MAC pricing is usually updated regularly in order to accommodate, among other things, the entrance and exit of various generic competitors from a given market.

17.     In general, TPPs and PBMs set MACs by gathering the prices of each manufacturer's version of a generic drug.  They then decide, using a formula based on Average Wholesale Price ("AWP"), the maximum amount they are willing to pay a pharmacy for any manufacturer's version of the generic. That amount becomes the MAC for all versions of a generic drug.  AWP is a benchmark price published by drug manufacturers but used as the basis for third-party payors' and pharmacy reimbursements.   While AWP remains the standard benchmark for reimbursement of brand drugs, AWP is used as the benchmark for reimbursement of generic drugs in the private marketplace only when there is no MAC price available.

18.     MAC-based reimbursement is designed to reduce the uncertainty that can be associated with generic pricing.  For example, absent MAC pricing, a third-party payor could pay $10.00 for one generic version of a drug, while paying $15.00 for another version. Pharmacies like Walgreens make more profit on generics that are priced based on Average

7

Wholesale Price, or AWP, rather than generics that are priced based on MAC.  However, TPPs pay far less for generics that are subject to MAC-based pricing.

19.    While TPPs and PBMs provide their MAC lists to pharmacies like Walgreens so that pharmacies can price based on those MACs, TPPs and PBMs consider their proprietary MAC lists to be highly confidential.  Those TPPs who do not develop their own MAC lists never have access to the MAC lists developed by their PBMs.  Indeed, they may not even know the methodology used by PBMs to develop those proprietary MAC prices.

20.    PMBT's PBM contract in place during the relevant period provides for generic drugs purchased at retail pharmacies to be reimbursed at AWP-14% plus a $2.50 dispensing fee or MAC plus $2.50 dispensing fee, whichever is applicable, for certain plan beneficiaries, or for other plan beneficiaries at AWP-35% plus a $1.90 dispensing fee or MAC plus a $1.90 dispensing fee, whichever is applicable.

## C.    Ranitidine

21.    Ranitidine was developed by Glaxo (now GlaxoSmithKline) and introduced under the brand-name Zantac in 1981.  Zantac went off-patent in July 1997 and numerous manufacturers launched generic versions of the drug.  The most popular dosage forms of ranitidine are 150-mg and 300-mg tablets, which are manufactured and marketed by several firms.  Only a few manufacturers have marketed 150-mg and 300-mg ranitidine *capsules*. Ranitidine tablets and ranitidine capsules are therapeutically equivalent, but because they are different *forms,* they are not AB-rated bioequivalents.  Accordingly, a pharmacist cannot fill a prescription for Zantac or ranitidine 150-mg or 300-mg tablets with capsules, or vice versa, without express written authorization from the prescribing physician.

8

22.     With several manufacturers producing ranitidine tablets, and tablets being the most popular dosage form, third-party payors and PBMs (including PMBT's PBM) adopted MACs specifying the amounts that they will pay or reimburse for ranitidine tablets.  MACs were not adopted for ranitidine capsules, however, because they were produced by only a few manufacturers and rarely prescribed.  Accordingly, payment and reimbursement for ranitidine capsules generally involves application of an AWP-based formula, and ranitidine capsules are therefore generally paid or reimbursed at a higher price than ranitidine tablets.

**D.     Fluoxetine**

23.     Fluoxetine hydrochloride (which has been sold under brand-names including Prozac and Sarafem) is a widely-prescribed antidepressant developed by Eli Lilly and Company. Eli Lilly's patent on fluoxetine expired in August 2001, prompting an influx of generic versions of the drugs onto the market.  The most popular dosage forms of fluoxetine are 10-mg and 20-mg capsules, which are manufactured and marketed by several firms.  Relatively few manufacturers have marketed 10-mg and 20-mg fluoxetine tablets.  Fluoxetine capsules and fluoxetine tablets are therapeutically equivalent, but because they are different *forms,* they are not AB-rated bioequivalents.  Accordingly, a pharmacist cannot fill a prescription for Prozac or fluoxetine 10-mg or 20-mg capsules with tablets, or vice versa, without express written authorization from the prescribing physician.

24.     With several manufacturers producing fluoxetine capsules, and capsules being the most popular dosage form, third-party payors and PBMs (including PMBT's PBM) adopted MACs specifying the amounts that they will pay or reimburse for fluoxetine capsules.  MACs were not adopted for fluoxetine tablets, however, because they were produced by only a few manufacturers and rarely prescribed.  Accordingly, payment and reimbursement for fluoxetine

9

tablets generally involves application of an AWP-based formula, and fluoxetine tablets are therefore generally paid or reimbursed at a higher price than fluoxetine capsules.

E.    **Selegiline**

25.    Selegiline is prescribed to treat early-stage Parkinson's disease, depression and senile dementia. The most popular dosage form of selegiline is 5-mg tablets, which are manufactured and marketed by several firms. Only a few companies market 5-mg selegiline capsules. Selegiline tablets and selegiline capsules are therapeutically equivalent, but because they are different *forms,* they are not AB-rated bioequivalents. Accordingly, a pharmacist cannot fill a prescription for selegiline 5-mg tablets with capsules, or vice versa, without express written authorization from the prescribing physician.

26.    With several manufacturers producing selegiline tablets, and tablets being the most popular dosage form, third-party payors and PBMs (including PMBT's PBM) adopted MACs specifying the amounts that they will pay or reimburse for selegiline tablets. MACs were not adopted for selegiline capsules, however, because they were produced by only a few manufacturers and rarely prescribed. Accordingly, payment and reimbursement for selegiline capsules generally involves application of an AWP-based formula, and selegiline capsules are therefore generally paid or reimbursed at a higher price than selegiline tablets.

F.    **Walgreens' Scheme to Wrongfully Inflate
      Reimbursement from Third-Party Payors**

27.    At all times relevant to this action, Walgreens has been primarily engaged in providing pharmaceutical services to customers through its retail pharmacies.

28.    Since at least July 1, 2001, Walgreens regularly inflated the amount of money billed for generic ranitidine, fluoxetine (after it became available in late 2001) and selegiline.

Walgreens adopted a corporate policy to systematically and unlawfully change prescriptions written for dosage forms that were subject to MAC reimbursement limits, to dosage forms that did not have MAC limits. This enabled Walgreens to evade the MACs and take advantage of the wide pricing deferential between dosage forms.

29.    Walgreens' pharmaceutical distribution system was set up so that it was difficult or impossible to fill prescriptions for dosage forms that were subject to MACs. For example, in *United States of America ex rel. Bernard Lisitza v. Walgreen Co.*, No. 03-C-00744 (N.D. Ill.), a former Walgreens pharmacist alleged that:

- "Upon receiving a [ranitidine] tablet prescription, Walgreens' pharmacy personnel could not process the orders as written, but instead filled the prescriptions with capsules."

-  "Walgreens pharmacists can switch between dosage forms in the Walgreens pharmaceutical dispensing computer system. For most Walgreens refills the Walgreens pharmacists received a prescription for ranitidine tablets and switched it to ranitidine capsules."

- "Walgreens pharmacists did not obtain physician authorization, even though it is legally required to switch between dosage forms."

30.    While ranitidine capsules and tablets are therapeutically equivalent, they are not AB-rated to each other such that pharmacists are permitted to fill a prescription for one for the other. In the normal course of business, ranitidine capsules are rarely, if ever, prescribed by physicians. By altering the prescriptions to fill capsules in place of tablets, or by substituting capsules for tablets without express physician authorization, Walgreens violated federal and state regulations concerning appropriate pharmaceutical care.

11

31.    While fluoxetine tablets and capsules are therapeutically equivalent, they are not AB-rated to each other such that pharmacists are permitted to fill a prescription for one for the other.  In the normal course of business, fluoxetine tablets are rarely, if ever, prescribed by physicians.  By altering the prescriptions to fill tablets in place of capsules, or by substituting tablets for capsules without express physician authorization, Walgreens violated federal and state regulations concerning appropriate pharmaceutical care.

32.    While selegiline tablets and capsules are therapeutically equivalent, they are not AB-rated to each other such that pharmacists are permitted to fill a prescription for one for the other.  In the normal course of business, selegiline capsules are rarely, if ever, prescribed by physicians.  By altering the prescriptions to fill capsules in place of tablets, or by substituting capsules for tablets without express physician authorization, Walgreens violated federal and state regulations concerning appropriate pharmaceutical care.

**G.    Damages to Plaintiff and the Class**

33.    The market rate for the dosage forms that were illegally substituted and billed by Walgreens is some two to four times higher than the appropriate MAC price for the drugs as prescribed.  This MAC price is the price at which Walgreens should have been reimbursed, had they properly filled the prescriptions with the proper dosage form as indicated on the prescription.

34.    Review of PMBT pharmaceutical reimbursement data reveals several instances in which Walgreens was paid by PMBT for the more expensive dosage forms, when the lesser expensive dosage form was available.  For example, the following chart includes selected fields from PMBT's pharmacy reimbursement records for ranitidine prescriptions filled by a particular

patient.  The transactions are arranged chronologically from November 20, 2001 through May 19, 2005.

| Pharmacy Name | Fill Date | Drug Label Name | QTY | Copay | AMT PD |
|---|---|---|---|---|---|
| FRED'S PHARMACY | 11/20/2001 | RANITIDINE HCL  150MG TAB | 60 | $ 8.00 | $ 14.96 |
| FRED'S PHARMACY | 4/10/2002 | RANITIDINE HCL  150MG TAB | 60 | $ 8.00 | $ 14.97 |
| FRED'S PHARMACY | 7/1/2002 | RANITIDINE HCL  150MG TAB | 60 | $ 8.00 | $ 14.97 |
| FRED'S PHARMACY | 8/6/2002 | RANITIDINE HCL  150MG TAB | 60 | $ 8.00 | $ 14.97 |
| KMART PHARMACY | 10/10/2002 | RANITIDINE HCL  150MG TAB | 60 | $ 8.00 | $ 14.97 |
| *WALGREENS* | 11/18/2002 | RANITIDINE HCL  150MG CAP | 60 | $ 8.00 | *$ 71.56* |
| *WALGREENS* | 12/21/2002 | RANITIDINE HCL  150MG CAP | 60 | $ 8.00 | *$ 71.56* |
| *WALGREENS* | 1/28/2003 | RANITIDINE HCL  150MG CAP | 60 | $10.00 | *$ 69.56* |
| *WALGREENS* | 5/27/2003 | RANITIDINE HCL  150MG CAP | 60 | $10.00 | *$ 69.56* |
| *WALGREENS* | 7/1/2003 | RANITIDINE HCL  150MG CAP | 60 | $10.00 | *$ 68.79* |
| *WALGREENS* | 8/4/2003 | RANITIDINE HCL  150MG CAP | 60 | $10.00 | *$ 68.79* |
| *WALGREENS* | 9/4/2003 | RANITIDINE HCL  150MG CAP | 60 | $10.00 | *$ 68.79* |
| KMART PHARMACY | 10/27/2003 | RANITIDINE HCL  150MG TAB | 60 | $10.00 | $ 12.97 |
| KMART PHARMACY | 12/15/2003 | RANITIDINE HCL  150MG TAB | 60 | $10.00 | $ 12.97 |
| KMART PHARMACY | 1/29/2004 | RANITIDINE HCL  150MG TAB | 60 | $10.00 | $  1.50 |
| KMART PHARMACY | 2/26/2004 | RANITIDINE HCL  150MG TAB | 60 | $10.00 | $  1.50 |
| KMART PHARMACY | 3/29/2004 | RANITIDINE HCL  150MG TAB | 60 | $10.00 | $  1.50 |
| KMART PHARMACY | 4/28/2004 | RANITIDINE HCL  150MG TAB | 60 | $10.00 | $  1.50 |
| KMART PHARMACY | 6/4/2004 | RANITIDINE HCL  150MG TAB | 60 | $10.00 | $  1.50 |
| KMART PHARMACY | 7/5/2004 | RANITIDINE HCL  150MG TAB | 60 | $10.00 | $  1.50 |
| KMART PHARMACY | 8/5/2004 | RANITIDINE HCL  150MG TAB | 60 | $10.00 | $  1.50 |
| KMART PHARMACY | 9/7/2004 | RANITIDINE HCL  150MG TAB | 60 | $10.00 | $  1.50 |
| KMART PHARMACY | 10/6/2004 | RANITIDINE HCL  150MG TAB | 60 | $10.00 | $  1.50 |
| KMART PHARMACY | 11/9/2004 | RANITIDINE HCL  150MG TAB | 60 | $10.00 | $  1.50 |
| KMART PHARMACY | 12/13/2004 | RANITIDINE HCL  150MG TAB | 60 | $10.00 | $  1.50 |
| KMART PHARMACY | 1/14/2005 | RANITIDINE HCL  150MG TAB | 60 | $10.00 | $ 12.97 |
| KMART PHARMACY | 2/16/2005 | RANITIDINE HCL  150MG TAB | 60 | $10.00 | $ 12.97 |
| KMART PHARMACY | 3/18/2005 | RANITIDINE HCL  150MG TAB | 60 | $10.00 | $ 12.97 |
| KMART PHARMACY | 4/19/2005 | RANITIDINE HCL  150MG TAB | 60 | $10.00 | $ 12.97 |
| KMART PHARMACY | 5/19/2005 | RANITIDINE HCL  150MG TAB | 60 | $10.00 | $   - |

(Emphasis added).  For all the prescriptions filled at pharmacies *other than* Walgreens, 150-mg ranitidine tablets were dispensed with a patient co-pay of $8 or $10.  PMBT's payments to the pharmacies ranged from nothing to $14.97 for each transaction.  For the seven prescriptions filled at Walgreens from November 18, 2002 through September 4, 2003, however, 150-mg

ranitidine *capsules* were dispensed.  It is unlikely that the patient even noticed the difference —
the patient copay was still $8 or $10 — but PMBT was charged from $68.79 to $71.56 for each
transaction.  These transactions follow the pattern of unlawfully switching prescriptions alleged
by the former Walgreens pharmacist in *United States of America ex rel. Bernard Lisitza v.
Walgreen Co.*, No. 03-C-00744 (N.D. Ill.).

## TOLLING OF THE STATUTE OF LIMITATIONS

35.     The running of any statute of limitations has been tolled by reason of Walgreens'
affirmative conduct in switching prescriptions, which prevented Plaintiff and the Class, in the
exercise of reasonable diligence, from determining that they were being charged for higher
priced products that were not prescribed by physicians.  Plaintiff did not know of Walgreens'
scheme and, in the exercise of reasonable diligence, could not have known until, at the earliest,
June 4, 2008, when the United States Department of Justice announced Walgreens' agreement to
reimburse governmental entities for Medicaid claims.  It was this revelation that first prompted
Plaintiff to review its pharmaceutical records for discrepancies.

36.     Plaintiff could not have discovered Walgreens' conduct through the exercise of
reasonable diligence because, except for tracking their total spend on, for example, the Top 25
drugs, TPPs do not generally track their drug spend by drug.  Instead, they are interested in
overall drug costs.  Moreover, even if a TPP utilized the services of a PBM, PBMs do not
generally provide reports that track pricing on a per-drug or per-drug class basis.  PBMs likewise
compare expenditures to national trends, meaning that if price increases occur nationwide, as
they would have here because Walgreens in located in every state except for Alaska, they are not
considered aberrational.

14

37.    In addition, while during the Class Period AWP-based pricing has been relatively transparent because AWPs are published in pharmaceutical pricing publications such as RedBook, First DataBank and Medi-Span, MAC-based pricing is not similarly transparent. Generally TPPs and PBMs that set their own, proprietary MACs consider those prices to be highly confidential:  they do not disclose the drugs on their MAC lists or the manner in which their MACs are derived.  Therefore, there was no reasonable way that TPPs like Plaintiff could have learned that they were paying for drugs not subject to MACs, when drugs subject to a MAC had been prescribed.

## CLASS ALLEGATIONS

38.    Plaintiff brings this class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class defined as follows:

> All third-party payors (including insurance companies, employers and union health and welfare funds) in the United States and its territories that, during the period from July 1, 2001 through 2005 (the "Class Period"), paid and/or reimbursed for all or part of prescriptions filled at Walgreens with:
>
> (a)    150-mg and 300-mg ranitidine *capsules*;
>
> (b)    10-mg and 20-mg fluoxetine *tablets*; and/or
>
> (c)    5-mg selegiline *capsules*:

Excluded from the Class are Defendant and its respective subsidiaries and affiliates, and all governmental entities**.**

39.The members of the Class are so numerous that joinder of all members is impracticable.  Walgreens has thousands of retail pharmacies and, at a minimum, hundreds of thousands of prescriptions for the drugs at issue were dispensed by Walgreens during the Class Period.

40.    Defendant's unlawful conduct and trade practices have targeted and affected all members of the Class in a similar manner, *i.e.*, they overpaid for ranitidine, fluoxetine and selegiline because the prescriptions of members, employees and insureds were unlawfully switched from the less-expensive dosage forms to the more expensive dosage forms.  Among the questions of law and fact common to the Class are:

(a)    whether Walgreens had a corporate policy of switching prescriptions without obtaining the prescribing physician's authorization;

(b)    whether Walgreens had a corporate policy of filling prescriptions with a different dosage form than the one indicated on the prescription without obtaining the prescribing physician's authorization;

(c)    whether Walgreens' pharmaceutical distribution system was set up to make it difficult or impossible to fill a prescription for ranitidine, fluoxetine and selegiline dosage forms that were subject to MACs;

(d)    the amount of the overcharges or amounts paid or reimbursed by members of the Class over and above the amounts they would have paid or reimbursed but for Walgreens' illegal acts as alleged herein; and

(e)    whether under common principles of unjust enrichment, Walgreens unjustly enriched itself to the detriment of Plaintiff and the Class, entitling Plaintiff and the Class to disgorgement of all monies resulting therefrom.

41.    Plaintiff's claims are typical of those of the Class they represent because Plaintiff and all of the Class members were injured in the same manner by Defendant's unlawful acts and practices, *i.e.*, it has paid for prescriptions wrongfully filled with dosage forms that were not subject to MACs.

42.    Plaintiff will fully and adequately protect the interests of all members of the Class. Plaintiff has retained counsel who are experienced in pharmaceutical class action litigation.  Plaintiff has no interests which are adverse to, or in conflict with, other members of the Class.

43.    The questions of law and fact common to the members of the Class predominate over any questions which may affect only individual members.

44.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## COUNT I

### *(For Restitution, Disgorgement and Constructive Trust for Unjust Enrichment)*

45.    Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein.

46.    As a result of the unlawful conduct described above, Defendant has been unjustly enriched.  Defendant's unlawful acts include, for the reasons alleged above, improperly switching prescriptions to more expensive dosage forms.  Defendant has been unjustly enriched, to the detriment of Plaintiff and the Class, by the receipt of, at a minimum, the reimbursement differential between the more expensive and less expensive dosage forms of ranitidine, fluoxetine and selegiline.  Defendant has benefitted from its unlawful acts and it would be inequitable for Defendant to be permitted to retain any of their ill-gotten gains resulting from the overpayments made by Plaintiff and the Class.

47.    Plaintiff and members of the Class are entitled to the amount of Defendant's ill-gotten gains resulting from Defendant's unlawful, unjust and inequitable conduct.  Plaintiff and

17

the Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiff and the Class members may make claims.

## COUNT II

***(Unfair and Deceptive Trade Practices in Violation of All States' Consumer Protection Acts)***

48.    Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein.

49.    Alternatively, Defendant's actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of thirty-five (35) state consumer protection statutes listed below:

> (1)    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. 44-1522, *et seq.*;

> (2)    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code 4-88-101, *et seq.*;

> (3)    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*;

> (4)    Defendant has engaged in unfair competition or unfair or deceptive acts or practices or have made false representations in violation of Colo. Rev. Stat. § 6-1-105, *et seq.*;

> (5)    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110b, *et seq.*;

> (6)    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Del. Code § 2511, *et seq.*;

(7)     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, *et seq.*;

(8)     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601, *et seq.*;

(9)     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1, *et seq.*;

(10)    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of 5 Me. Rev. Stat. § 207, *et seq.*;

(11)    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. L. Ch. 93A, *et seq.*;

(12)    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. § 445.901, *et seq.*;

(13)    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325F.67, *et seq.*;

(14)    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Vernon's Mo. Rev. Stat. § 407.010, *et seq.*;

(15)    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*;

(16)    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.*;

(17)    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*;

19

(18)     Defendant has engaged in unfair competition or unfair, unconscionable or deceptive acts or practices in violation of N.J. Stat. Ann. § 56:8-1, *et seq.*;

(19)     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. § 57-12-1, *et seq.*;

(20)     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*;

(21)     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*;

(22)     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code § 51-15-01, *et seq.*;

(23)     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Ohio Rev. Stat. § 1345.01, *et seq.*;

(24)     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605, *et seq.*;

(25)     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws § 39-5-10, *et seq.*;

(26)     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37-24-1, *et seq.*;

(27)     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47-18-101, *et seq.*;

(28)     Defendant has engaged in unfair competition or unfair or deceptive or practices in violation of Tex. Bus. & Com. Code § 17.41, *et seq.*  This claim is limited to class members with assets of less than $25 million;

(29)   Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code Ann. § 13-1 1-1, *et seq.*;

(30)   Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Vt. Stat. Ann. tit. 9, § 245 1, *et seq.*;

(31)   Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code § 59.1-196, *et seq.*;

(32)   Defendant has engaged in unfair competition or unfair, deceptive or fraudulent acts or practices in violation of Wash. Rev. Code. § 19.86.010, *et seq.*;

(33)   Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code § 46A-6-101, *et seq.*;

(34)   Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Wis. Stat. § 100.20, *et seq.*, and

(35)   Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Wyo. Stat. § 40-12-100, *et seq.*

50.   As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and the Class have suffered actual economic damage by paying excessive and unwarranted amounts for ranitidine capsules that were not prescribed by physicians.

WHEREFORE, Plaintiff prays that:

A.   the Court determine that this action may be maintained as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.   Plaintiff and each member of the Class be awarded damages and, where applicable, multiple and other damages, including interest;

21

C.    Plaintiff and each member of the Class recover the amounts by which Defendant has been unjustly enriched;

D.    Plaintiff and the Class recover their costs of suit, including reasonable attorneys' fees and expenses as provided by law;

E.    Plaintiff and the Class be granted such other and further as the Court deems just and necessary.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury of all issues so triable in this case.

Dated: April 2, 2009

PIRELLI ARMSTRONG TIRE CORPORATION RETIREE MEDICAL BENEFITS TRUST

By: s/ *Anthony F. Fata*
    One of its Attorneys

Kenneth A. Wexler
email: KAW@wexlerwallace.com
Jennifer Fountain Connolly
email: JFC@wexlerwallace.com
**WEXLER WALLACE LLP**
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Tel: (312) 346-2222
Fax: (312) 346-0022

Patrick E. Cafferty
email: pcafferty@caffertyfaucher.com
Anthony F. Fata
email: afata@caffertyfaucher.com
Dom J. Rizzi
email: drizzi@caffertyfaucher.com
**CAFFERTY FAUCHER LLP**
30 North LaSalle Street, Suite 3200
Chicago, IL 60602
Tel: (312) 782-4880
Fax: (312) 782-4485

George E. Barrett
Gerald E. Martin
David Garrison
**BARRETT, JOHNSTON & PARSLEY**
217 Second Avenue North
Nashville, TN 37201
Tel: (615) 244-2202
Fax: (615) 252-3798

*Attorneys for Plaintiff*

22